Compensation Appeals Board
No. 99-327

APPEAL OF LOUIS COTE

(New Hampshire Compensation Appeals Board)

August 28, 2001

*Boynton, Waldron, Doleac, Woodman & Scott, P.A.*, of Portsmouth (*Christopher E. Grant* on the brief and orally), for the petitioner.

*Wiggin & Nourie, P.A.*, of Manchester (*Andrew A. Merrill* on the brief and orally), for the respondent.

DALIANIS, J. The petitioner, Louis Cote, appeals a decision of the New Hampshire Compensation Appeals Board (board) regarding his permanent impairment award. We vacate and remand.

The relevant facts follow. In February 1985, the petitioner injured his back while working as a towel machine operator for the respondent, James River Corporation. The petitioner's entitlement to workers' compensation benefits was decided by this court in *Appeal of Cote*, 139 N.H. 575 (1995). The current dispute concerns the calculation of the petitioner's permanent impairment award.

On June 9, 1997, Dr. James Forbes, one of the petitioner's former treating physicians, prepared a permanent impairment report at the request of the respondent's claims adjuster. Dr. Forbes reported that the petitioner had reached maximum medical improvement and assigned him a ten percent whole person impairment rating based upon Table 75 of the AMERICAN MEDICAL ASSOCIATION'S GUIDE TO THE EVALUATION OF PERMANENT IMPAIRMENT (GUIDE), which is within the range of motion model section of the GUIDE.

On October 29, 1997, Dr. Bruce Myers prepared a report entitled "Permanent Impairment Rating" on behalf of the petitioner. After reviewing the petitioner's medical records and performing a physical evaluation, Dr. Myers evaluated the petitioner's permanent impairment rating at twenty percent based upon the range of motion model in the GUIDE.

In May 1998, the department of labor (DOL) held a hearing at the petitioner's request regarding his eligibility for a permanent impairment award. The DOL found that the petitioner was entitled to a ten percent permanent impairment award at the compensation rate of sixty percent of his average weekly wage. The petitioner appealed to the board for a *de novo* hearing. The board heard testimony from the petitioner, Dr. Myers and Dr. Gerald DeBonis. Additionally, the board had before it the permanent impairment evaluations from both Dr. Forbes and Dr. Myers.

At the hearing, Dr. Myers reiterated his opinion that the petitioner had a twenty percent permanent impairment rating based upon the range of motion model in the GUIDE. He further testified that with the petitioner's injury, the range of motion model was the preferable method to use in determining permanent impairment.

Dr. DeBonis testified on behalf of the respondent. Dr. DeBonis had not examined the petitioner, but testified that based upon his review of the petitioner's medical records, the injury model should have been used in determining the petitioner's permanent impairment, thus contradicting Dr. Myers' opinion. Dr. DeBonis testified that according to the injury model, the petitioner was entitled to a permanent impairment rating of five percent.

On February 23, 1999, the board issued its unanimous decision finding that the petitioner did not meet his burden of establishing entitlement to a permanent impairment award of twenty percent. Specifically, the board found Dr. DeBonis' opinion that the petitioner's permanent impairment assessment should be based upon the injury model "far more persuasive" than Dr. Myers' opinion that the assessment should be based upon the range of motion model. The board rejected the submitted permanent impairment evaluations by Dr. Forbes and Dr. Myers because both were based upon the range of motion model. The board found that while Dr. DeBonis' testimony was competent to contradict the opinion of Dr. Myers, it did "not rise to the level necessary to constitute competent medical evidence in issuing a permanent impairment rating." The board, however, stated that "it is undisputed that the claimant has suffered a permanent impairment, and as such his right to such an award should be preserved. Upon the filing of motions for rehearing, and the submission of permanent impairment evaluations using the injury model by the [petitioner's] treating physician and an independent medical examiner, the panel will reconvene, if necessary, to review the evidence submitted." The board further held that the compensation rate of sixty percent, which was the statutory com-

pensation rate in effect in 1997, applied because the board found that the petitioner reached maximum medical improvement in 1997.

On March 15, 1999, the petitioner filed a motion for a rehearing. Attached to this motion was another permanent impairment report authored by Dr. Myers. Dr. Myers indicated that he still believed that the range of motion model was the most suitable method for evaluating the petitioner's permanent impairment; nonetheless, he provided an assessment based upon the injury model that assigned a seventeen percent permanent impairment rating to the petitioner. The board denied the motion because the petitioner's "attorney has requested that the record not be kept open to allow the parties to submit evaluations using the injury model."

On appeal, the petitioner argues that the board erred in: (1) rejecting Dr. Myers' report concluding that he had a permanent impairment of twenty percent because it was based upon the range of motion model instead of the bodily injury model; (2) determining that the petitioner's average weekly wage for purposes of calculating his permanent impairment compensation was his average weekly wage in 1997; (3) deciding that the petitioner's permanent impairment award should be calculated using the sixty percent compensation rate; (4) refusing to consider Dr. Myers' permanency assessment report based upon the bodily injury model; and (5) failing to apply or even address the doctrine of judicial estoppel against the respondent.

"We will overturn the board's decision only for errors of law, or if we are satisfied by a clear preponderance of the evidence before us that the order is unjust or unreasonable. The board's findings of fact will not be disturbed if they are supported by competent evidence in the record, upon which the board's decision reasonably could have been made." *Appeal of Kehoe*, 141 N.H. 412, 415 (1996) (citations omitted).

■ The petitioner first asserts that the board erred in rejecting Dr. Myers' permanent impairment evaluation because Dr. Myers is the only doctor who conducted the specific permanent impairment assessment physical examination required by the GUIDE. Pursuant to RSA 281-A:32, XII (1999), in calculating a permanent impairment award, "[i]n the event of a dispute as to the amount of compensation or the percentage of permanent partial loss or both, the commissioner shall determine the award to be made on the basis of competent medical evidence." RSA 281-A:32, XIV provides that in determining a permanent impairment award, the commissioner shall utilize the most recent edition of the GUIDE. Pursuant to

section 3.3 of the GUIDE, each permanent impairment evaluation "should include a complete, accurate medical history and a review of all pertinent records, [and] a careful and thorough physical examination." Further, section 3.3 provides that the evaluator should use the injury model unless the injury does not fit within a list of specified injuries, in which case the range of motion model may be used.

Here, after conducting a physical examination of the petitioner, Dr. Myers concluded that the range of motion model should be used in assessing the petitioner's permanent impairment. Although he did not conduct a physical examination, Dr. DeBonis concluded that after reviewing the petitioner's medical record and Dr. Myers' report, the petitioner's injury fit within the injury model. After hearing testimony from both doctors, the board held that the permanent impairment rating should be based upon the injury model.

The petitioner contends that the board erroneously relied upon Dr. DeBonis' opinion in rejecting Dr. Myers' evaluation, because Dr. DeBonis never examined the petitioner. The respondent, however, asserts that the board properly relied upon Dr. DeBonis' testimony to discredit Dr. Myers' evaluation because Dr. DeBonis did not testify as an examining physician, but only as to the GUIDE and the manner in which Dr. Myers' assessment failed to comply with it. The respondent contends that the board correctly recognized that Dr. DeBonis' testimony would not qualify as competent testimony to establish the range of permanent impairment that the petitioner suffered, but his testimony nonetheless could be used to discredit Dr. Myers' assessment of permanent impairment. We agree.

We will not disturb the board's factual findings or its decision, if supported by competent evidence in the record. *Petition of Gilpatric*, 138 N.H. 360, 364 (1994). Further, we afford the board discretion to credit or discredit the testimony of the expert witnesses. *Id.* Here, the board acted within its discretion in rejecting Dr. Myers' assessment because the record contains competent evidence, namely, the testimony of Dr. DeBonis, that the petitioner's injury fits within the injury model. Thus, even assuming that the petitioner is correct that a physical examination is required to make a permanent impairment assessment, it is within the board's discretion whether to accept that assessment when it has another expert opinion that contradicts the evaluation.

 Next, the petitioner contends that the board erred in setting the date of maximum medical improvement as June 1997, the month

Dr. Forbes prepared his report, for purposes of computing his average weekly wage. Specifically, the petitioner asserts that he reached maximum medical improvement in January 1994, when he returned to work full time in his lab technician position after receiving an occupational therapy work capacity report in December 1993. He contends that the evidence showed that he had worked at this position since 1994 without further problems to his back, thus demonstrating that the point at which he reached maximum medical improvement occurred in 1994. The respondent, however, contends that the board correctly determined that the average weekly wage should be computed from June 1997, the date upon which the petitioner's maximum medical improvement was first assessed. We agree.

Pursuant to RSA 281-A:32, XI (1999), "[p]ayment of the scheduled award becomes due upon prompt medical disclosure, after maximum medical improvement has been achieved . . . ." Further,

the average weekly wage forming the basis to calculate benefits for such permanent impairment must be determined with reference to the date of the loss of capacity. Although the date of the loss may coincide with the date of the injury, the loss will more commonly occur later. In such a case, the basis for the benefit calculation is the average wage at the time at which the permanency of the loss becomes evident, which will normally be the date of prompt medical disclosure regarding the final extent of the loss.

*Petition of Correia*, 128 N.H. 717, 720 (1986) (citations, quotations and brackets omitted). Here, the board found that "a review of the medical records indicates that the claimant did not see a physician between 1993 and 1997, when the two permanent impairment awards were prepared. No evidence exists in [the] file that the claimant had reached a maximum medical improvement prior to Dr. Forbes' evaluation."

The petitioner's argument that he reached maximum medical improvement upon receiving the 1993 occupational therapy report is not persuasive. The report reveals that it does not contain any opinion as to whether the petitioner had reached maximum medical improvement. The report merely states that the petitioner's "performance is rated at the MEDIUM/HEAVY duty level . . . . Mr. Cote is working within his current safe limits . . . ." Further, while it may be true that the petitioner has worked full time in his lab technician job since 1994 without reported incident to his back, "the date of prompt medical disclosure regarding the final extent of the

loss" did not come until Dr. Forbes' 1997 opinion letter. *Id.* The plaintiff presented no evidence that he had reached maximum medical improvement between 1993 and 1997.

■ The petitioner next asserts that the board erred in determining that his permanent impairment award should be based upon the sixty percent compensation rate that became effective on February 8, 1994, rather than the sixty-six and two-thirds percent compensation rate in effect when he sustained his injury in 1985. The respondent, however, contends that the board correctly determined that the relevant date for computing a permanent impairment award is the date upon which the permanency of the loss is established and not the date of the injury.

RSA 281-A:32, I, provides that a permanent impairment award shall be paid in accordance with RSA 281-A:28 (1999), which sets the compensation rate for temporary total disability benefits. Prior to 1994, RSA 281-A:28, II, provided in part, that "weekly compensation shall be 66-⅔ percent of that employee's average weekly wage." This rate was amended from sixty-six and two-thirds percent to sixty percent in 1994. Laws 1994, 3:7. The statute provided that this amendment shall apply to injuries occurring on or after Feb. 8, 1994. Laws 1994, 3:24. The petitioner contends that because his injury occurred in 1985, he is entitled to compensation at the sixty-six and two-thirds percentage rate. We agree.

The respondent contends that the relevant date for the applicable compensation rate is the date of maximum medical improvement. While our case law regarding permanent impairment has focused upon the date maximum medical improvement is established as being the relevant date for the accrual of benefits, *see, e.g., Ranger v. N.H. Youth Dev. Center*, 117 N.H. 648, 651 (1977); *Petition of Markievitz*, 135 N.H. 455, 457 (1992), the instant case is distinguishable. Here, the legislature has explicitly provided that the decreased compensation rate applies only to injuries that occurred on or after February 8, 1994. "[G]iven the remedial nature of workers' compensation laws, all reasonable doubts will be liberally construed in a manner that favors the injured employee." *Petition of L'Heureux*, 132 N.H. 498, 501 (1989). Thus, because the legislature has evinced its intent that the sixty percent compensation rate apply only to injuries that occur after February 8, 1994, we hold that the petitioner is entitled to the sixty-six and two-thirds compensation rate.

■ Next, the petitioner contends that the board erred in denying his motion for rehearing to which he attached a permanency

impairment evaluation by Dr. Myers using the injury model. We agree.

In its original decision, the board invited the petitioner to submit an assessment based upon the injury model. The petitioner complied with this directive, yet the board denied the motion, stating that "[t]he claimant's attorney has requested that the record not be kept open to allow the parties to submit evaluations using the injury model." The record, however, does not contain any evidence that the petitioner's attorney requested that the record be closed. To the contrary, the petitioner submitted the evaluation as requested by the board. The respondent contends that the board's denial was justified because in the petitioner's motion he argued that the methodology supporting his second evaluation was incorrect and that he continued to rely upon Dr. Myers' initial evaluation. We disagree. While it is true that the petitioner continued to advocate for Dr. Myers' initial evaluation based upon the range of motion model, he nonetheless provided the requested evaluation using the injury model. The petitioner's motion for rehearing provided additional evidence that the board should have considered. *See Appeal of Gilbert*, 142 N.H. 842, 845 (1998). Accordingly, we vacate the board's decision and remand for further proceedings in accordance with this opinion.

*Vacated and remanded.*

BROCK, C.J., and BRODERICK, NADEAU and DUGGAN, JJ., concurred.